

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00483-CR
No. 02-24-00484-CR
No. 02-24-00485-CR
No. 02-24-00486-CR
No. 02-24-00487-CR

_____

ANTHONY RYAN PATTERSON, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 78th District Court
Wichita County, Texas
Trial Court Nos. DC78-CR2023-0552-4, DC78-CR2023-0552-5, DC78-CR2023-0552-6, DC78-CR2023-0552-7, DC78-CR2023-0552-10

---

Before Kerr, Womack, and Walker, JJ.
Memorandum Opinion by Justice Kerr

**MEMORANDUM OPINION**

Appellant Anthony Ryan Patterson appeals his five convictions for trafficking Macy (Count 4), indecency by exposure with Macy (Counts 5 and 7) and Maribel (Count 6), and sexual performance by Macy (Count 10) concerning two incidents in November and December 2017.[1] Patterson raises five issues: (1) his convictions for human trafficking and its predicate offenses violated his double-jeopardy rights, *see* Tex. Penal Code Ann. §§ 20A.02(a)(7)(B), (I), 21.11, 43.25; (2)–(3) the evidence was legally insufficient to support his sexual-performance conviction; (4) the trial court's introduction of a document the State called the "Halloween candy" cover story violated his confrontation rights; and (5) the trial court improperly allowed a forensic interviewer—instead of Mother—to testify as an outcry witness, *see* Tex. Code Crim. Proc. Ann. art. 38.072. We will affirm.

## I. Background

After a multi-agency investigation, the State charged Patterson with thirteen counts of human trafficking (Counts 1–4), indecency with a child (Counts 5–7), sexual performance by a child (Counts 8–10), and employment harmful to children (Counts 11–13). *See* Tex. Penal Code Ann. §§ 20A.02(a)(7)(B), (I), 21.11, 43.25, 43.251.

---

[1]We use pseudonyms to refer to the two complaining witnesses who were minors when the offenses were committed, and we refer to their family members other than Jandreani Bell by their relationship to the complainants to protect their privacy. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

Patterson's child victims were sisters Macy and Maribel, who were respectively ten and eight years old during the two 2017 incidents.

The jury heard evidence that before the two 2017 incidents, Patterson had hired prostitutes, including Bell, from a now-defunct webpage named Backpage that was used for human trafficking and selling prostitution. The jury also heard that police had twice investigated Patterson when he had told phone-sex workers about his fantasies of sexually abusing children while being blasphemous.

In November 2017—the first incident—Bell and two other adults drove her cousin's daughters, Macy and Maribel, from Vernon, Texas to meet Patterson in Wichita Falls. Patterson then drove Bell and the two girls to his house. After they went inside, Bell instructed the girls to get naked in a bathtub, and they did. Patterson was also in the bathroom with them. At some point, Bell told the girls to "do everything he said."

Bell and the girls left the bathroom wearing towels and got on Patterson's bed. Patterson got naked in front of them. Bell then told the girls to rub baby oil on Patterson's legs, and they did. After Maribel went to take a shower, Anthony "hovered over" Macy and instructed her "to tickle his private part," which she did while he touched himself. He ejaculated on her. Macy testified that afterward Patterson held a Bible and told the girls to say "F Jesus." Patterson gave the girls a bucket of candy while they waited in the living room, paid Bell, and drove them all back to the car that had brought them to Wichita Falls. Bell gave each girl $10.

3

During the second incident, in late December 2017, Bell and the girls were at a family party. Bell told Macy that there was someone outside who wanted to meet her. Macy went outside. When she arrived at a waiting car, Macy saw the two people who had previously taken her to meet Patterson, and she tried to run back inside. But Bell grabbed her and pulled her into the car.

Bell and Macy were again driven to meet Patterson in Wichita Falls, and he drove them to his house. This time, Macy, Bell, and Patterson got naked on his bed. Macy described Bell as putting "red candy stuff . . . on [Patterson's] private part." She "was instructed to put [her] mouth down there," which she did. Macy then went to the living room. After that, Patterson drove Macy and Bell to meet the other two people, who drove Macy home.

That night, Mother questioned the girls, and they reluctantly told her some of what had happened to them in November. A few days later, Mother called the police. In March 2018, forensic interviewer Denise Roberts spoke with the girls. The girls named Bell but could only describe Patterson's appearance and identify his first name.

The police eventually arrested Bell. In a recorded jail call to her family, Bell said that she would get "Anthony" to pay for her bail and lawyer. She also repeatedly tried calling Patterson from jail. Consequently, the police identified Patterson and learned that he was paying for Bell's legal expenses.

After Bell's release, she initially agreed to meet with an investigator, but she went "dark." Bell was later indicted for human trafficking, and she was again arrested.

Police drove Bell directly from the jail to her apartment, where she gave them a one-page document—what she called a letter and the State called the "Halloween candy cover story"—containing what appeared to be scripted answers in the first person about two children who had been taken to a masseuse's client's house. The first five paragraphs read:

> I knew a client of mine had a lot of Hallloween caandy left over so I thought it would be a good thing to bring them over and let them enjoy some candy because I knew they didn't get that type of treatment at home. They are like my little grrls and I've always taken care of them. So while we were there I showed them around the house and they had never seen a baathtub so big before. It had water jetts all in it. They wanted to get into it so I let them. I guess I just thought it would be a good experience considering where they are coming from.

> Afterwards they sat in the living room eating caandy and him and I had a ~~sexual encoounter~~ massage. Now whether or not they came in the room to watch us I don't know. I was under the impression the door was locked . . . But there was absolutely no iintent on my part of anything like what I'm accused of.

> Now I told the mom that I had brought them over there. I was even transparent with her on what had happened with the encoounter. She came up with an idea to see if she could get more money if she could involve her D's. She asked me this I'm assume because she's strung out on drugs. . . . . I told her absolutely not. She kept persisting and persisting and I continued to say no.

> The only thing I can think of is this became an idea for the mom to get more money and she talked to her D's about it and it became their own reality. What I can tell you is the mom got mad at me about _____ and started talking like she was going to black maail me on taking her D's over there if I didn't get her some money.

> At this point, now I find myself here.

Patterson was later arrested. During a videotaped interview with a Texas Ranger, Patterson acknowledged that he had a "father-daughter kink" and a blasphemy fetish. He also admitted to hiring Bell as a prostitute and said that she knew of these sexual predilections. At first, Patterson told the Texas Ranger that no children had been to his house, but in line with the Halloween candy cover story, Patterson admitted that Bell had brought two girls over to get leftover Halloween candy. He stated, "There was absolutely no sexual situation going on with . . . young girls." He also stated that the girls were in a separate room when he "was getting a massage" from Bell.

Patterson later admitted to the Texas Ranger, "I lied to you about the girls at first because it was just embarrassing." Claiming to have done nothing wrong, Patterson said that the girls' mother was a drug dealer who needed money and had gotten "crossways" with Bell, had "talked the girls into telling" lies, and had blackmailed Bell, who in turn had blackmailed Patterson.

The case was tried to a jury, which found Patterson guilty of human trafficking Macy (Count 4), indecency by exposure with Macy (Counts 5 and 7) and Maribel (Count 6), and sexual performance by Macy (Count 10) and found him not guilty of the other eight counts. The jury assessed his punishment at ten years' confinement for human trafficking, five years for each of the three indecency convictions, and eighteen years for sexual performance. The trial court sentenced him accordingly, ordered that

6

some of the sentences run consecutively, and signed judgments of conviction. Patterson appealed.

## II. Double Jeopardy

In his first issue, Patterson argues that his convictions and punishments for human trafficking, indecency with a child by exposure, and sexual performance concerning Macy (Counts 4, 7, and 10) violated his federal double-jeopardy rights. He contends that he was punished "twice"—for the indecency and sexual-performance offenses and again for the human-trafficking offense, which relied on the same conduct as the indecency and sexual-performance offenses.[2] *See* U.S. Const. amends. V, XIV. We disagree.

The Double Jeopardy Clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, protects a defendant from multiple punishments for the same offense. U.S. Const. amends. V, XIV; *Brown v. Ohio*, 432 U.S. 161, 165, 97 S. Ct. 2221, 2225 (1977); *Bien v. State*, 550 S.W.3d 180, 184 (Tex. Crim. App. 2018); *Ex parte Benson*, 459 S.W.3d 67, 71 (Tex. Crim. App. 2015). But the

---

[2]Patterson does not raise a double-jeopardy challenge under the Texas Constitution. Consequently, we limit our analysis to the federal Double Jeopardy Clause. *See Ex parte Lewis*, 219 S.W.3d 335, 338–71 (Tex. Crim. App. 2007) (analyzing the Texas and federal double-jeopardy protections); *Ex parte Necessary*, 333 S.W.3d 782, 787 n.1 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("Because the state constitutional [double-jeopardy] right has not been invoked in this case, it is unnecessary for us to address the protection afforded by the state constitution, including whether or how that protection differs from the rights provided by the United States Constitution.").

Double Jeopardy Clause "is not violated if the legislature intended to authorize multiple punishments." *Ho v. State*, No. 02-24-00035-CR, 2025 WL 1197375, at *6 (Tex. App.—Fort Worth Apr. 24, 2025, pet. ref'd) (mem. op., not designated for publication) (first quoting *Thetford v. State*, No. 02-18-00488-CR, 2021 WL 278913, at *12 (Tex. App.—Fort Worth Jan. 28, 2021) (mem. op., not designated for publication), *rev'd in part on other grounds*, No. PD-0258-21, 2021 WL 2674484 (Tex. Crim. App. June 30, 2021) (not designated for publication); and then citing *Villanueva v. State*, 227 S.W.3d 744, 747 (Tex. Crim. App. 2007)). And the legislature did so here.

The human-trafficking statute relies on proving an underlying predicate offense. *See* Tex. Penal Code Ann. § 20A.02(a). Pertinent to this case, a defendant commits trafficking when he "traffics a child" and causes her to become the victim of indecency or sexual performance. *See id.* §§ 20A.02(a)(7)(B), (I); 21.11, 43.25. Regarding whether a defendant can be punished for both human trafficking and the predicate offense, the statute states, "If conduct constituting an offense under this section also constitutes an offense under another section of this code, the actor may be prosecuted . . . under both sections." *Id.* § 20A.02(c).

Such language "plainly expresses" the legislature's intention that an accused—such as Patterson—should suffer multiple punishments for human trafficking and its predicate offenses. *See Littrell v. State*, 271 S.W.3d 273, 278–79 & n.30 (Tex. Crim. App. 2008); *Singleton v. State*, No. 05-18-00255-CR, 2019 WL 2353444, at *2–3 (Tex. App.—Dallas June 4, 2019, no pet.) (mem. op., not designated for publication)

8

(overruling double-jeopardy complaint where appellant was convicted and punished for human trafficking and a predicate sexual assault); *Moreno v. State*, 413 S.W.3d 119, 130–31 (Tex. App.—San Antonio 2013, no pet.) (same concerning human trafficking and compelling-prostitution predicate); *see also Ritz v. State*, 533 S.W.3d 302, 307 (Tex. Crim. App. 2017) (Newell, J., concurring) ("[T]he legislature sought to provide as much protection . . . as possible by allowing prosecution for both human trafficking and the product of that trafficking"). Because the legislature has plainly spoken through Section 20A.02(c), Patterson's convictions and punishments for human trafficking and the underlying predicate offenses—in Counts 4, 7, and 10—do not violate double jeopardy. *See* Tex. Penal Code Ann. § 20A.02(c); *Littrell*, 271 S.W.3d at 278. Accordingly, we overrule his first issue.

### III. Sexual Performance Evidentiary Sufficiency

In his second and third issues, Patterson challenges the sufficiency of the evidence to support his sexual-performance conviction in Count 10 (either by individually committing or being a party to the offense). The evidence is sufficient.

**A. Sufficiency Standard of Review**

In our review of the sufficiency of the evidence, we view all the evidence in a light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). The factfinder alone determines the evidence's

9

weight and credibility; we may not usurp that role. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021); *Queeman*, 520 S.W.3d at 622.

**B. Essential Elements of Sexual Performance by a Child**

A person commits the offense of sexual performance by a child if, "knowing the character and content thereof, he employs, authorizes, or induces a child younger than [14] years of age to engage in sexual conduct or a sexual performance." Tex. Penal Code Ann. § 43.25(b), (c).[3] "Sexual conduct" includes "lewd exhibition of the genitals, the anus, or any portion of the female breast below the top of the areola." *Id.* § 43.25(a)(2). The statute does not define "lewd exhibition," but in analyzing whether a depiction of naked children is "lewd" under Section 43.25(a)(2) for purposes of child pornography, the court of criminal appeals has approved consideration of such factors as whether the depiction's setting is sexually suggestive, whether it is associated with sexual activity, whether it is intended to elicit a sexual response, and whether the child is partially or fully nude. *Romo v. State*, 663 S.W.3d 716, 719–20 (Tex. Crim. App. 2022).

"A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." Tex. Penal Code Ann. § 7.01. "Each party to an offense may

---

[3]When the victim is younger than 14 years of age, the offense is a first-degree felony. Tex. Penal Code Ann. § 43.25(c).

be charged with commission of the offense." *Id.* "A person is criminally responsible for an offense committed by the conduct of another if[,] . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* at § 7.02(a)(2); *In re State ex rel. Weeks*, 391 S.W.3d 117, 124 (Tex. Crim. App. 2013).

**C. The Evidence**

Patterson argues that the evidence is insufficient because the State failed to prove beyond a reasonable doubt that he authorized or induced a sexual performance or that he was a party to the offense. He cites the "performance" definition of a "play, motion picture, photograph, dance, or other visual representation that can be exhibited before an audience of one or more persons." S*ee* Tex. Penal Code Ann. § 43.25(a)(3). And he argues, "No one danced. There is no proof that anyone took pictures . . . . Nor is there any other 'visual representation that can be exhibited' beyond the retina of an eyeball.'"

But Patterson is merely setting up a strawman argument. As we have quoted above, the sexual-performance statute requires proof of either "sexual conduct or a sexual performance," *see id.* § 43.25(b), and here, the State offered proof of "sexual conduct," *see id.* § 43.25(a)(2)—not a "performance," *see id.* § 43.25(a)(3). Unlike a "performance," "sexual conduct" does not require proof of "a play, motion picture, photograph, dance, or other visual representation that can be exhibited before an audience." *Id.* § 43.25(a)(2), (3); *see also Emenhiser v. State*, 196 S.W.3d 915, 930 &

11

n.4 (Tex. App.—Fort Worth 2006, pet. ref'd) ("Recording the lewd exhibition of a minor's genitals on film or other media is not an element of the offense.").

Perhaps recognizing as much, Patterson also baldly asserts, "There is no evidence of sexual conduct by the child"; "[n]o child lewdly exhibited her genitals, anus, or any portion of her breast below the top of the areola." But the evidence shows the contrary. Macy testified that during the December incident (1) she was driven to meet Patterson; (2) upon entering his house, she "had to get naked"; (3) while she, Bell, and Patterson were naked, Bell put "red candy stuff . . . all over [Patterson's] private part"; (4) Macy was "instructed to put [her] mouth" on Patterson's private part, which she did; and (5) Patterson taught her "how to kiss" while she was still naked.

After viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found beyond a reasonable doubt that Patterson—either acting individually or as a party to the offense—authorized or induced Macy, who was under the age of 14, to engage in a lewd exhibition, which constituted the sexual conduct required for Patterson's sexual-performance conviction. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *see also Nash v. State*, No. 07-19-00298-CR, 2020 WL 2786894, at *2 (Tex. App.—Amarillo May 27, 2020, pet. ref'd) (mem. op., not designated for publication) (holding that a defendant's

12

inducing a child to exhibit her breasts was "lewd" when nothing suggested a "pure . . . motive").[4] We overrule Patterson's second and third issues.

## IV. Confrontation Clause

In his fourth issue, Patterson contends that the trial court's admission of the document that the State called the Halloween candy cover story violated his confrontation rights. Because the document was nontestimonial, the trial court did not err by admitting it.

---

[4]In response to the State's sur-reply—despite Patterson's arguing in his opening brief that the State did not prove a "performance"—he asserts that the "sexual[-]conduct or sexual[-]performance" provision is not at issue. Rather, Patterson claims that his focus is on the mental-state element—that "whatever the conduct of a defendant in a performance prosecution," the defendant's mental state must be proven, and the evidence here was legally insufficient to support Patterson's culpable mental state. But on this element, Patterson argued in his opening brief that "the evidence is insufficient to support the very gravamen of the statute, *i.e.*, a sexual *performance reflected in material* in which a defendant might know its sexually explicit content. [Emphasis added.]" Because "material" is not a statutory element of "sexual conduct"—which the State proved instead of proving a "performance"—Patterson is improperly attempting to tie the mental-state provision to a non-existent element. *See Emenhiser*, 196 S.W.3d at 930 & n.4; *see also Sulak v. State*, Nos. 02-15-00371-CR, 02-15-00372-CR, 2016 WL 3452914, at *1–3 (Tex. App.—Fort Worth June 23, 2016, pet. ref'd) (mem. op., not designated for publication) (overruling sufficiency challenge attacking a non-element for sexual performance). Based on the testimony about what occurred during the November and December incidents, the evidence is legally sufficient that Patterson knew that during the December incident the conduct induced was sexual in character and content. *See Dornbusch v. State*, 156 S.W.3d 859, 869 (Tex. App.—Corpus Christi–Edinburg 2005, pet. ref'd). The evidence is thus legally sufficient to support Patterson's culpable mental state on his sexual-performance conviction (Count 10). *See id.*

## A. Applicable Law and Standard of Review

The Sixth Amendment's Confrontation Clause, applicable to the states through the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." *Crawford v. Washington*, 541 U.S. 36, 42, 124 S. Ct. 1354, 1359 (2004); *Langham v. State*, 305 S.W.3d 568, 575 (Tex. Crim. App. 2010) (citing U.S. Const. amend. VI). Once a defendant raises a Confrontation Clause objection, the State must establish either (1) that the proposed statement does not contain testimonial hearsay and thus does not implicate the Confrontation Clause or (2) that the statement does contain testimonial hearsay but is nevertheless admissible. *See De La Paz v. State*, 273 S.W.3d 671, 680–81 (Tex. Crim. App. 2008).

Although the United States Supreme Court has not defined the outer boundaries of what constitutes a "testimonial" out-of-court statement, *see Martinez v. State*, No. 02-18-00447-CR, 2019 WL 4678426, at *3 (Tex. App.—Fort Worth Sept. 26, 2019, pet. ref'd) (mem. op., not designated for publication) (citing *Crawford*, 541 U.S. at 68, 124 S. Ct. at 1374), the Confrontation Clause "applies to 'witnesses' against the accused—in other words, those who 'bear testimony,'" *see id.* (citing *Crawford*, 541 U.S. at 51, 124 S. Ct. at 1364). A statement is thus testimonial when it packages a statement relevant to the issues in a criminal trial for delivery as testimony at that later trial:

> "[T]estimonial statements are those 'that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *Burch v. State*, 401 S.W.3d 634, 636 (Tex. Crim. App. 2013). In determining whether a statement is testimonial, we review the objective purpose of the statement, not the declarant's expectations. *Coronado v. State*, 351 S.W.3d 315, 324 (Tex. Crim. App. 2011). Statements are testimonial when the circumstances objectively indicate that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution. *Id.*

*Florez v. State*, No. 02-16-00195-CR, 2017 WL 2471095, at *5 (Tex. App.—Fort Worth June 8, 2017, no pet.) (mem. op., not designated for publication).

We generally review a trial court's decision to admit evidence under an abuse-of-discretion standard. *Wall v. State*, 184 S.W.3d 730, 743 (Tex. Crim. App. 2006). But when, as here, the admission of evidence involves a constitutional legal ruling—in this case, whether a statement is testimonial or nontestimonial for Confrontation Clause purposes—we give almost total deference to the trial court's determination of historical facts, but we review de novo the trial court's application of the law to those facts. *See Langham*, 305 S.W.3d at 576; *Wall*, 184 S.W.3d at 742 (applying hybrid standard of review to issue of whether statement was testimonial).

## B. Analysis

The Halloween candy document is typewritten with a few handwritten notations on it, is unsigned and undated, and is not addressed to anyone. It is written from the first-person perspective of a sex-worker and contains a five-paragraph narrative and then a series of questions and answers.

Patterson asserts that the State intended to use the document to prove Patterson's guilt. In contrast, the State argues that the document does not prove Patterson's guilt. Rather, it maintains that the document was intended to provide a cover-up story or "script" in response to the girls' sexual-abuse allegations by creating an innocent story while also diverting attention away from Patterson—for instance, by describing the client as an out-of-town government employee, who was a "[l]ight Mexican."

"Testimonial" statements are typically formal, solemn declarations made for the purpose of establishing a fact. *See Russeau v. State*, 171 S.W.3d 871, 880 (Tex. Crim. App. 2005). Here, the Halloween candy document does not fall within the categories of testimonial evidence described in *Crawford*. The document was not an affidavit, the product of a custodial examination, or "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 52, 124 S. Ct. at 1364; *Burch*, 401 S.W.3d at 636 ("While the exact contours of what is testimonial continue to be defined by the courts, such statements are formal and similar to trial testimony.").

According to trial testimony, Bell handed the statement to the police after being driven directly from the jail to her apartment. The State points to handwriting exemplars it offered from Patterson and Patterson's video-recorded statement to the Texas Ranger telling much of the same story as is in the document and argues that the

16

trial court could have determined that Patterson either wrote the document or adopted it as his own statement.

But whether the trial court determined that Patterson wrote or adopted all or part of the document, the trial court could have determined that its primary purpose was to provide both Patterson and Bell with a cover story to further their efforts to escape criminal responsibility for human trafficking and abusing Macy and Maribel. Indeed, during the trial court's hearing concerning the document's admissibility, Patterson's counsel acknowledged that his "co-conspirator, Jandreani Bell, said this letter was written by [Patterson]." And in his appellate brief, Patterson argues that "the prosecution [had] introduced a letter written by an alleged co-conspirator who did not appear or testify."

Generally, a co-conspirator's statements made in the furtherance of the conspiracy are nontestimonial. *See King v. State*, 189 S.W.3d 347, 359 (Tex. App—Fort Worth 2006, no pet.) (citing *Crawford*, 541 U.S. at 56, 124 S. Ct. at 1367). Here, the Halloween candy document, viewed in context of how it was acquired and what it stated, does not show that an objective witness could form a reasonable belief that it would be used at trial to inculpate Patterson; instead, it documents Patterson's and Bell's concerted effort to create a story that they could use to obscure the facts of

their human trafficking and abusing Macy and Maribel and to avoid prosecution.[5] *See, e.g., Orona v. State*, 341 S.W.3d 452, 463 (Tex. App.—Fort Worth 2011, pet. ref'd) (holding co-conspirator's statements that were made to conceal their crime were nontestimonial). Because the Halloween candy document is nontestimonial, we conclude that the trial court did not err by admitting the complained-of statements over Patterson's Confrontation Clause objection. *See Crawford*, 541 U.S. at 56, 124 S. Ct. at 1367; *Orona*, 341 S.W.3d at 463; *King*, 189 S.W.3d at 359. We overrule Patterson's fourth issue.

## V. Outcry-Witness Testimony

In his fifth issue, Patterson argues that the trial court erred by allowing forensic interviewer Roberts to testify as an outcry witness because she was not the first adult to whom Macy and Maribel had disclosed the abuse. According to Patterson, because Roberts did not qualify as an outcry witness, her testimony regarding Macy's and Maribel's outcry statements should have been excluded as hearsay. We disagree.

### A. Applicable Law and Standard of Review

"Hearsay statements, while generally inadmissible, may be admitted under specific conditions when public policy supports their use, and the circumstances surrounding the making of those statements [guarantee] their reliability." *Martinez v.*

---

[5]We need not reach Patterson's additional argument concerning Bell's unavailability. *See* Tex. R. App. P. 47.1; *McCarty v. State*, 227 S.W.3d 415, 418 (Tex. App.—Texarkana 2007), *aff'd*, 257 S.W.3d 238 (Tex. Crim. App. 2008).

*State*, 178 S.W.3d 806, 810 (Tex. Crim. App. 2005). Article 38.072, also known as the outcry statute, creates a hearsay exception in certain child-sexual-offense prosecutions. Tex. Code Crim. Proc. Ann. art. 38.072; *Crump v. State*, No. 02-24-00063-CR, 2025 WL 18288, at *2 (Tex. App.—Fort Worth Jan. 2, 2025, pet. ref'd) (mem. op., not designated for publication).

Article 38.072 permits testimony from one outcry witness per event—that is, "the first person, 18 years of age or older, other than the defendant, to whom the child . . . made a statement about the offense." Tex. Code Crim. Proc. Ann. art. 38.072, § 2(a); *see Crump*, 2025 WL 18288, at *2; *Gibson v. State*, 595 S.W.3d 321, 326 (Tex. App.—Austin 2020, no pet.). Courts construe "about the offense" to mean a statement that "in some discernible manner describes the alleged offense." *Garcia v. State*, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990). "[T]he statement must be more than . . . a general allusion" of sexual abuse. *Id.*

In addition, an adult who does not remember the outcry cannot be the outcry witness. *Petty v. State*, No. 02-21-00130-CR, 2022 WL 4545532, at *5 (Tex. App.—Fort Worth Sept. 29, 2022, pet. ref'd) (mem. op., not designated for publication); *Foreman v. State*, 995 S.W.2d 854, 859 (Tex. App.—Austin 1999, pet. ref'd) (holding that victim's mother and stepfather were not proper outcry witnesses when they both testified that they had no memory of the outcry). Thus, the proper outcry witness is not necessarily the first adult to whom the child revealed the abuse but, rather, the first adult to whom the child revealed specific details concerning the offense. *Garcia*, 792 S.W.2d at

19

91; *see, e.g., Moore v. State*, No. 02-23-00152-CR, 2025 WL 353068, at \*6–7 (Tex. App.—Fort Worth Jan. 30, 2025, no pet.) (mem. op., not designated for publication) (affirming trial court's determination that because a child's prior statements to her mother lacked sufficient detail, the proper outcry witness was an adult who later interviewed the child).

Because of the difficulty that often arises in deciding who is a proper outcry witness, trial courts maintain "broad discretion" over such decisions, which appellate courts review under an abuse-of-discretion standard. *Garcia*, 792 S.W.2d at 92; *Rodgers v. State*, 442 S.W.3d 547, 552 (Tex. App.—Dallas 2014, pet. ref'd); *Foreman*, 995 S.W.2d at 859. Under this standard, "a trial court's ruling will only be deemed an abuse of discretion if it is so clearly wrong as to lie outside 'the zone of reasonable disagreement' or is 'arbitrary or unreasonable.'" *Mendez v. State*, No. 03-19-00546-CR, 2021 WL 1148960, at \*5 (Tex. App.—Austin Mar. 26, 2021, no pet.) (mem. op., not designated for publication) (first quoting *Lopez v. State*, 86 S.W.3d 228, 230 (Tex. Crim. App. 2002); and then quoting *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005)).

## B. Error Preservation

Before analyzing Patterson's outcry complaint, the State urges us to consider whether Patterson forfeited part of his appellate complaint. He did.

In general, to preserve a complaint for appellate review, a defendant must make a timely and specific objection to the trial court. Tex. R. App. P. 33.1(a); *Wood v. State*,

693 S.W.3d 308, 323 (Tex. Crim. App. 2024). The trial objection must then match the complaint raised on appeal. *Wood*, 693 S.W.3d at 323. And regarding challenges to outcry testimony, "[m]aking specific objections to each act or event is particularly important [for] numerous separate and discrete acts of sexual assault, each of which could have a separate outcry witness." *Eldred v. State*, 431 S.W.3d 177, 185 (Tex. App.—Texarkana 2014, pet. ref'd).

During the Article 38.072 hearing, Patterson's counsel objected to the alleged overlap between Mother's and Roberts's outcry-witness testimony for the November 2017 incident, but as for the December 2017 incident, his counsel stated, "we don't have an objection at that time." In his appellate brief, Patterson argues that "[n]either Mother nor Roberts was an outcry witness to" the November incident, but because this is not the same objection Patterson made in the trial court, he has forfeited it on appeal. *See Wood*, 693 S.W.3d at 323. Additionally, Patterson complains about the December incident, but he has forfeited any complaints about Roberts being the proper outcry witness concerning the December incident because he expressly limited his trial objection to the November incident. *See Eldred*, 431 S.W.3d at 185.

## C. Analysis

Regarding the November incident, Patterson contends that "[M]other was the clear outcry witness, learning about the exposure well before [Macy] arrived to her interview with Roberts." But the proper outcry witness is not necessarily the first

21

adult to whom a child revealed the abuse; rather, it is the first adult to whom the child revealed specific details concerning the offense. *See Garcia*, 792 S.W.2d at 91.

At the Article 38.072 hearing, the State acknowledged that Macy and Maribel had told Mother about some of the November incident before Roberts had interviewed each of them. But it asserted that (1) Mother could not definitively say when Macy and Maribel had described the abuse—that is, whether it was before or after Roberts had interviewed the girls—and (2) their statements to Mother were general allusions of abuse that lacked sufficient detail to constitute outcry statements.

Mother testified that the first time Macy and Maribel told her about the November incident was the night of the December incident. She said that when the girls got home, Macy showered, so she began questioning Maribel.

When asked what Maribel had told her had happened, Mother testified that Maribel had told her they had been with her cousin and a man and "that she [had] massaged him and rubbed oil on him." Mother said,

> I guess he was having sex with my cousin in front of them. And then she told me that he told her to put her clothes on and get dressed and for her to go into the living room. And him and, I guess, my daughter [Macy] stayed in there. And she said she was sitting in the living room, which is [Maribel], and I guess he was in the jacuzzi with [Bell] and [Macy]. And she was -- I guess they was --

At that point, the State interjected that Mother had said "I guess" several times and clarified with Mother that this had happened "a while ago," and Mother agreed with the State that "there[ were] some things that [she] remember[ed,] . . . [a]nd

22

there[ were] some things that [she] w[as]n't so sure about." Mother then agreed that there were "some things that [she'd] read either online or in the paper."

Then, after clarifying what night Mother was talking about and confirming Bell's relation to Mother, the State asked Mother what Maribel had told her that Bell had done. Mother began, "I guess, like -- well -- ," and the State again told her "[n]o more guessing." Mother denied guessing but said, "I don't know why I keep saying that" before testifying that Bell took the girls to Wichita Falls "to meet a man," although the girls did not know the meeting location.

The State refocused Mother about what Maribel had told her about the November incident, and Mother testified as follows:

> Just basically what she was telling me that they was in Wichita. Her and her sister [Macy] was in Wichita, and they was in a jacuzzi with a man. And he told them to get -- well, he told her, [Maribel], to get dressed and go in the living room, and the other one stayed in there, which is [Macy]. And she said that she -- which was several months later after I had filed charges and stuff about the situation, it was several months later, she was telling me when I was combing her hair one day that she heard [Macy] saying F, F that and stuff. And, I mean, she told me that -- I guess they had sex in front of [Macy].

Mother testified that she knew her children and that they would not lie to her.

The State attempted to clarify Mother's testimony. Mother testified that the man drove the girls in a truck and had them duck until they got inside a garage. When they got to his house, they went inside, "[a]nd [Bell] told them to get butt naked and whatever he say do, do."

Mother testified that when Macy got out of the shower and heard Maribel telling Mother "some of the stuff," Macy said that Maribel "was lying." Mother asked Macy what was going on and tried to get the truth from her. Mother said they argued and finally Macy told her:

> [T]hey met a guy at the school or the nursing home and he told them -- no, they got in the car -- when they got in the truck. She basically told the same thing [Maribel] said. At first, that she got in the truck. And when she got in the truck, they had to keep their head down until they got in the garage. The garage door closed and they get out. And they go in the house and [Bell] tells them to get naked and do whatever he says.

When asked to give details about what Maribel said, Mother responded as follows:

> She told me that they got naked and they went -- they stood in front of him, I guess, and he told the youngest one, which is [Maribel], to go get dressed and go in the living room. [Macy] stayed in there. And, I guess, I don't know. I don't know. I guess maybe [Bell] and him, the guy, had sex or whatever in front of [Maribel] -- [Macy].

The State asked whether Macy had told Mother about Bell and the man having sex, and Mother testified that "[Macy] told me later on down the line." Mother continued, "At first, she wasn't admitting to none of it, none of the stuff, and it took her a long time to admit to some of the stuff, but she eventually told me piece by piece."

The State asked for clarification, and Mother said that Macy described how the girls gave the man "a massage with the oil or whatever." When the man told Maribel to go to the living room, Macy had stayed in the room. Mother again stated that Macy was not forthcoming about what had happened:

> It took her a while. She -- I had to get it out of her, but she said -- at first she was saying that she didn't do anything with him because I thought --

24

I guess she thought I was going to get mad at her or something. But later on, she told me that -- that he -- she had oral -- [Bell] had oral sex with the guy in front of her. She watched them.

When asked whether this was before or after Roberts had interviewed the girls, Mother testified, "Well, I'm not for sure if everything she told me was before. I think -- I'm not for sure. I think she told me a bunch -- a bunch of the stuff came out after" Roberts's forensic interview.

Mother then testified that Maribel had told her about the "F God" part after the forensic interview. And Mother then testified—without naming a specific girl— that "[s]he had already told me about [Bell] having oral sex with the guy in front of her. She had already told me that." Mother testified that the girls believed the man's name was either "Anthony" or "Ryan Lane Patterson." Mother confirmed that when Macy started talking, her story was similar to Maribel's, and Mother reiterated that she believed both girls were telling the truth.

On cross-examination, Mother acknowledged that the first time either Macy or Maribel had told her about Patterson was in December. Defense counsel tried to pin down what things were told that night versus later, and Mother provided little clarity:

I'm pretty sure everything that [Maribel] said happened that night when she was telling me. I'm pretty sure that's everything that happened. But later on down the line -- like if I go to her now, I could ask her a question and she would tell me. She'll tell me some more stuff. They -- I don't know, they come up with more stuff. But the thing is is that the things that they're saying, I know is true because it's just about what they told me.

25

Defense counsel then led Mother through a series of questions about what Mother had told the police—about her kids being driven to Wichita Falls, riding and ducking down in a truck, and going into a house where Bell told them to disrobe and "do whatever he says."

Counsel questioned Mother about what Maribel and Macy had told her. Some of the things Mother confirmed they said, but Mother also testified that

> [s]he told me that both of them got naked. He told [Maribel] to put her clothes on and go back in the living room and -- no. At first she -- I guess they got in the jacuzzi and they gave him a massage. She gets out of the jacuzzi, I'm guessing, and he tells her to put her clothes on and go sit in the living room. She goes to the living room, but [Macy] stays.

Then, contradicting her prior testimony about not remembering when Macy had told her about the oral sex, Mother said she thought Macy had told her before the forensic interview.

Roberts testified after Mother. The State proposed that Roberts was the proper outcry witness because (1) she had testified in greater detail than Mother and (2) Mother had testified with uncertainty and speculation.

The situation is similar to that found in *Maybin v. State*, in which the parties contested whether the child victims' mother or forensic interviewers were the proper outcry witnesses. No. 03-22-00414-CR, 2023 WL 5437164, at *1 (Tex. App.—Austin Aug. 24, 2023, no pet.) (mem. op., not designated for publication). In *Maybin*, the children had first spoken to their mother, but "she could not remember exactly what the children had told her, alluded that they had shared more details with her after the

26

forensic interview than they had initially, and testified that she had forgotten and blocked out the details." *Id.* at *4. The court determined that the interviewers were the proper outcry witnesses. *Id.*; *see also Reynolds v. State*, 227 S.W.3d 355, 370 (Tex. App.— Texarkana 2007, no pet.) (holding that "wavering" and "equivocal" testimony from a mother that included "I think" and "I don't remember" authorized a trial court to conclude that the child "did not report in a discernible manner either of the alleged offenses to [her] or that [she] could not remember what she was told").

Here, Mother gave inconsistent and vacillating testimony about what she had heard and when she had learned the details from each daughter about the November incident, and she admitted that she learned some of the details after the forensic interview. Her testimony was also speculative; twenty times she specifically said she was guessing.

On this record, the trial court could have reasonably concluded that (1) Mother could not recall when she learned the details of the November incident—and had learned some after the forensic interview, including from media sources; and (2) Macy's and Maribel's prior disclosures to Mother lacked sufficient detail to qualify as outcry statements and that their true outcry was to Roberts. *See Garcia*, 792 S.W.2d at 91; *Maybin*, 2023 WL 5437164, at *4; *cf. Reynolds*, 227 S.W.3d at 370. Thus, we cannot conclude that the trial court abused its broad discretion by allowing Roberts's outcry-witness testimony. *See Garcia*, 792 S.W.2d at 92; *Venancio v. State*,

Nos. 02-21-00147-CR, 02-21-00148-CR, 2022 WL 17687436, at *4 (Tex. App.—Fort Worth Dec. 15, 2022, no pet.) (mem. op., not designated for publication).

But even if we were to assume that the trial court abused its discretion by allowing Roberts to testify as an outcry witness, the error would be harmless. *See Nino v. State*, 223 S.W.3d 749, 754 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (explaining that error in designating an outcry witness is reversible only if it affects the appellant's substantial rights). The improper admission of an outcry witness's testimony is harmless when the victim testifies about the same instances of abuse. *Petty*, 2022 WL 4545532, at *7; *Thomas v. State*, 1 S.W.3d 138, 142 (Tex. App.—Texarkana 1999, pet. ref'd).

In its brief, the State summarized Roberts's and the girls' testimony about Patterson's conduct during the November incident to show its cumulative nature:

| Roberts's Testimony | The Girls' Testimony |
|---|---|
| Macy disclosed that in November 2017, Bell told the girls that she was taking them out to eat, but instead took them from their house in Vernon to a school in Wichita Falls. | Macy testified that after Bell said she was taking them out to eat, she took them from their house in Vernon to a school in Wichita Falls. |
| Macy disclosed that other adults, a woman named Kamisha and the male driver known as "Gentry," also made the trip. | Macy testified that a male named "Gentry" drove her to Wichita Falls. Another adult, Kamisha, also rode with them. |
| Macy disclosed that upon arriving in Wichita Falls, Bell and the girls had ridden in a black truck with "Anthony" to a house while Bell and "Anthony" | Macy testified that upon getting to Wichita Falls, she rode with Bell and "Anthony" in a black truck to his house while being instructed to duck. |

28

| | |
|---|---|
| instructed them to duck. | |
| Macy said that upon arriving, Bell told the girls to take their clothes off and get in a jacuzzi, and they did so. | Macy testified that at Bell's instruction, the girls got naked in a jacuzzi. |
| Macy said that while the girls were naked in the tub, "Anthony" walked in. | Macy testified that "Anthony" was in the bathroom while the girls were naked. |
| Macy said that the girls were told to get out of the jacuzzi, go into "Anthony's" room, and sit on his bed while covered with towels. | Macy testified that after leaving the jacuzzi, upon being told to, she sat on Patterson's bed while wearing a towel. |
| Macy said that as "Anthony" was on the bed naked, Bell instructed the girls to rub oil on him, and they did. | Macy testified that as "Anthony" was on the bed naked, Bell instructed the girls to rub oil on him, and they did. |
| Macy said the girls got dressed, "Anthony" gave Bell money, he gave the girls a "whole bunch of candy," and Bell later gave the girls $10 each. | Macy testified that "Anthony" told Bell he was giving her money, he gave the girls "a bucket of candy," and Bell later gave the girls $10 each. |
| Maribel said that around the time of Mother's birthday (in November), she had ridden in a black truck to "Anthony's" house, and they had been told to duck on the way. | Maribel testified that near the time of Mother's birthday, she rode in a black truck to "Anthony's" house while being instructed to duck. |
| Maribel said that upon arriving at "Anthony's" house, "the girls got naked in a jacuzzi," and Patterson came in the bathroom. | Maribel testified that at "Anthony's" house, she got naked in a bathtub, and he was in the bathroom. |
| Maribel said that Bell had given them $10. | Maribel testified that Bell gave them $10. |

Because Roberts's testimony about the November incident was cumulative of Macy's and Maribel's, any purported error in admitting it was harmless. *See Petty*, 2022 WL 4545532, at *7; *see also Allen v. State*, 436 S.W.3d 815, 822 (Tex. App.—

29

Texarkana 2014, pet. ref'd) (concluding that because the victim had "testified, without objection, to the same facts that were contained in her outcry," the admission of the outcry witness's testimony "[had] not influence[d] the jury's verdict or [had] had but a slight effect"). We thus overrule Patterson's fifth issue.

## VI. Conclusion

Having overruled Patterson's five issues, we affirm the trial court's judgments of conviction on Counts 4–7 and 10.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: November 6, 2025